16-1356-cv
Leopard Marine & Trading, Ltd. v. Easy Street Ltd.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

August Term, 2016

(Argued: February 16, 2017                    Decided: July 13, 2018)

Docket No. 16-1356-cv

_____

LEOPARD MARINE & TRADING, LTD.,

*Plaintiff - Appellee*,

v.

EASY STREET LTD.,

*Defendant - Appellant*.

_____

Before: POOLER, PARKER, and LIVINGSTON, *Circuit Judges*

Leopard Marine & Trading, Ltd. seeks a declaratory judgment that a

maritime lien held by Easy Street Ltd., a Cypriot fuel supply company, has been

extinguished by laches. Easy Street contends that the court should dismiss the

case on grounds of international comity because of a pending in rem proceeding in Panama regarding the lien that is the subject of this case. Easy Street also disputes that laches bars exercise of the lien. The United States District Court for the Southern District of New York (Rakoff, *J.*), sitting in admiralty, declined to abstain on grounds of international comity and issued a declaration that laches barred exercise of the lien.

We determine, first, that the federal courts have jurisdiction to declare a maritime lien unenforceable, even where the vessel is not present in the district, so long as its owner consents to adjudication of rights in the lien. We then hold that abstention on the basis of international comity is not required in this case, and that the district court did not abuse its discretion in ruling that laches barred exercise of the lien.

Affirmed.

Judge Debra Ann Livingston dissents in a separate opinion.

_____

| Appearing for Appellant: | BRITON P. SPARKMAN (George M. Chalos, *on the brief*), Chalos & Co, P.C., Oyster Bay, NY. |

2

Appearing for Appellee:  CHRISTOPHER H. DILLON, Burke & Parsons, New York, NY.

David S. Bland, Julie Maria Araujo, Bland & Partners PLLC, New Orleans, LA

POOLER, *Circuit Judge*:

We decide here whether Easy Street Ltd., a Cypriot fuel supply company, has a valid maritime lien against a vessel, the M/V Densa Leopard (the "Vessel"). A maritime lien is "[a] lien on a vessel," given for one of several purposes, including "to secure the claim of a creditor who provided maritime services to the vessel." Black's Law Dictionary 1065 (10th ed. 2014). In this case, the Vessel's owner, Leopard Marine & Trading, Ltd., a Maltese company, sued for a declaratory judgment that Easy Street may not exercise the maritime lien because of laches. The United States District Court for the Southern District of New York (Rakoff, *J.*), sitting in admiralty, declined to abstain on grounds of international comity in deference to an ongoing suit in Panama in which Easy Street has attempted to exercise the lien. The district court then issued a declaration that laches has extinguished the lien.

3

We determine that the federal courts have jurisdiction to declare a maritime lien unenforceable; that abstention on the basis of international comity is not required in this case; and that the district court did not abuse its discretion in ruling that laches extinguished the lien. We thus AFFIRM the district court's judgment.

## BACKGROUND

### I. Factual Background

This case arises from an ocean vessel's unpaid fuel bill. In 2011, the Vessel's owner, Leopard Marine, chartered[1] the Vessel to Allied Maritime, Inc., thus allowing Allied to operate the Vessel for a period of time. As part of the chartering agreement, Allied gave Leopard Marine a cargo lien worth the amount owed for using the Vessel.

On August 23, 2011, Allied bought fuel for the Vessel from Easy Street in Mejillones, Chile, at a price of $848,847.60. Allied agreed to pay Easy Street for the fuel by September 26, 2011.  By purchasing the fuel, a maritime lien arose on the Vessel in Easy Street's favor, which would allow Easy Street to seize the

---

[1] To "charter," in this context, refers to "[t]he leasing or hiring of . . . [a] ship[] or other vessel." Black's Law Dictionary 284 (10th ed. 2014).

Vessel pursuant to the lien if the fuel bill went unpaid. *See Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 982 F.2d 765, 766 (2d Cir. 1992) ("A maritime lien is[] a special property right in the vessel, arising in favor of the creditor by operation of law as security for a debt or claim. The lien arises when the debt arises, and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds."). Under American law, Allied, as the charterer of the Vessel, could give third parties such liens even without the Vessel's owner's consent. *See* 46 U.S.C.A. §§ 31341, 31342.

Allied returned the Vessel to Leopard Marine on November 4, 2011, with significant fuel left in it. On December 2, 2011, Leopard Marine provided Allied a payment credit of $409,853.10 for the fuel's value, and Allied made the final payment for use of the Vessel, which was set off in part by the fuel credit.

Allied did not pay Easy Street—the fuel provider—when the fuel invoice was due, and Easy Street undertook efforts to recover the amount owed under the invoice. Demitrios Chasampalis, the only full-time employee of Easy Street in 2011, stated that he sent electronic notices and attended "about 100 meetings," "in person . . . [i]n Allied offices," between when the invoice was issued in 2011

5

and sometime in 2012. App'x at 240, 246-47. During the meetings, which occurred "almost every two [or] three days," he "demanded payment of the invoice," among other outstanding issues between the two companies. App'x at 249-50. He testified that he did not seek "a settlement" of the money that was owed, but instead demanded payment of the invoice in full. App'x at 249-50. On March 16, 2012 and April 20, 2012, evidently after scores of in-person meetings had already been held, Allied sent two written notices to Easy Street, each promising to pay within a month. App'x at 321-24. But Allied did not honor either of the notices, and ultimately never paid the fuel bill.

On April 15, 2012, Allied entered into involuntary bankruptcy proceedings following a motion by third-party creditors. On November 6, 2012, a Greek court declared Allied bankrupt, and ruled that Allied was "considered (retrospectively) to have stopped payments to its creditors since [January 1, 2012]." App'x at 325. The parties agree that seeking recovery from the bankruptcy estate would be futile.

Easy Street never considered suing Allied before its bankruptcy, at least in part because of the companies' strong ties to each other. Chasampalis stated that

the relationship between Allied and Easy Street was "such that they had me like their son," and that he "believed in them." App'x at 254.

It was also not until at least September of 2012, after Allied entered into involuntary bankruptcy proceedings, that Easy Street considered pursuing remedies against Leopard Marine, and began tracking the Vessel for arrest. Although there is some dispute as to when Easy Street first informed Leopard Marine that Allied's bill was unpaid, the earliest Easy Street claims to have done so was in October of 2013. In any event, Easy Street sent Leopard Marine an email on March 30, 2015, demanding payment of $1,394,807.76—the amount of the unpaid fuel bill plus interest and legal fees.

During 2011 and 2012, the Vessel passed through a number of ports where Easy Street could have arrested it and exercised the maritime lien. Easy Street conceded in the district court that the Vessel was in the Port of Vancouver, Canada, from March 17, 2012 until March 22, 2012, in Panama from April 4, 2012 to April 5, 2012, and in Brazil from June 5, 2012 to June 12, 2012. The district court noted, and Easy Street does not dispute, that exercise of its maritime lien

would have been legally possible—even if costly and protracted—in each of those ports.

On April 19, 2015, Easy Street arrested the Vessel in Panama, exercising its maritime lien for the unpaid fuel in an in rem action there.[2] The next day, Leopard Marine commenced this action, seeking a declaratory judgment that Easy Street's lien is barred by laches, and also seeking attorneys' fees and costs.

**II. Proceedings Below**

This appeal reviews two orders entered by the district court. The first denied Easy Street's motion to dismiss, brought under two theories: international comity and lack of personal jurisdiction. *Leopard Marine & Trading, Ltd. v. Easy St., Ltd.*, No. 15-cv-3064, 2015 WL 4940109 (S.D.N.Y. Aug. 6, 2015) (hereinafter "Motion to Dismiss Order"). Easy Street first argued that the Panamanian courts had already exercised jurisdiction over part of the proceedings, and so the district court should abstain from considering the case, either through dismissal or stay. The district court concluded that this case did not raise the "exceptional circumstances" necessary for abstention. The court also determined that it had

---

[2] Leopard Marine was required to post a bond worth more than two million dollars in Panama to serve as security for the release of the Vessel.

8

personal jurisdiction because of a United States forum selection clause in the fuel supply contract between Easy Street and Allied, even though Leopard Marine was not a party to that contract. The court reasoned that, because American law allows a party chartering a vessel to bind the vessel's owner to contracts, Easy Street should have foreseen that Leopard Marine, the Vessel's owner, might later seek to enforce any favorable provision—including a choice-of-law provision—in a contract between Easy Street and Allied.

The second order considered whether, on the basis of laches, Easy Street should be foreclosed from enforcing its maritime lien against the Vessel. *Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*, No. 15-cv-3064, 2016 WL 3144058 (S.D.N.Y. Apr. 8, 2016) ("Summary Judgment Order"). The court concluded that laches barred the exercise of the lien, as Easy Street had delayed exercising the lien and the delay prejudiced Leopard Marine. The court focused, in particular, on the fact that Easy Street waited until after Allied had gone bankrupt to exercise the lien, which eliminated a number of otherwise reasonable means of repayment. Had Leopard Marine known that Easy Street intended to enforce the lien on the Vessel to be repaid for the fuel, Leopard Marine could have exercised its own

9

lien against Allied's cargo pursuant to the chartering agreement, or pursued an arbitration against Allied in London. But after Allied entered bankruptcy, these were no longer realistic possibilities.

Easy Street appealed the district court's decisions not to abstain on grounds of international comity, and to bar exercise of the lien on grounds of laches.

## DISCUSSION

### I. Federal Jurisdiction

While the parties did not raise any jurisdictional challenges in the district court, "[w]e have an independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte*." *In re Quigley Co., Inc.*, 676 F.3d 45, 50 (2d Cir. 2012). To do so, we consider whether there is jurisdiction in admiralty over a suit brought under the Declaratory Judgment Act, 28 U.S.C. § 2201, to adjudicate maritime lien rights within an in personam action.[3]

---

[3] We note that Congress provided, in the provisions pertaining to maritime liens within the Commercial Instruments and Maritime Liens Act ("CIMLA"), *see* 46 U.S.C. § 31341 et seq., statutory bases for the origination, enforcement, and discharge of maritime liens, certain of which will be discussed in due course. Some courts have treated these provisions as conferring federal question

10

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). In enacting the Declaratory Judgment Act, "Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). Thus, "the requirements of jurisdiction—the limited subject matters which alone Congress had authorized the District Courts to adjudicate—were not impliedly repealed or modified." *Id.* at 672. Therefore, "if, but for the availability of the declaratory judgment procedure," there would be no jurisdiction over the issues involved in the suit, then "jurisdiction is lacking."

---

jurisdiction—in addition to admiralty jurisdiction—where a declaration is sought under CIMLA's provisions as to the invalidity of a lien. *See Cianbro Corp. v. George H. Dean, Inc.*, 596 F.3d 10, 11 (1st Cir. 2010) (noting, in a case requesting declaratory judgment regarding maritime lien, that "[b]ecause . . . we are required to interpret the Maritime Lien Act to resolve the issues presented, this controversy is deemed properly before us."). Here, however, Leopard Marine does not claim that it has satisfied the requirements for a declaratory judgment pursuant to 46 U.S.C. § 31343(c), and the parties have not otherwise suggested that we have federal question jurisdiction based on CIMLA. Thus, we address only the question of whether we have admiralty jurisdiction over this dispute.

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 16 (1983) (quotation marks omitted).

To decide whether federal jurisdiction exists to entertain a claim for declaratory relief, courts follow *Skelly Oil*'s approach to "conceptually realign the declaratory judgment parties and claims and analyze them as they would appear in a coercive suit." *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 67 (2d Cir. 2012); *see also Skelly Oil*, 339 U.S. at 672 ("If Phillips sought damages from petitioners or specific performance of their contracts, it could not bring suit in a United States District Court on the theory that it was asserting a federal right. . . . [S]uch a suit would 'arise' under the State law governing the contracts."). Thus, if the defendant in a declaratory suit could have sued in federal court, seeking non-declaratory relief on the same claims pressed in the declaratory suit, then federal courts have jurisdiction over the declaratory action. *See Garanti Finansal*, 697 F.3d at 68 ("[W]e have summarized the law as follows: a complaint seeking a declaratory judgment is to be tested, for purposes of the well-pleaded complaint rule, as if the party whose adverse action the declaratory

12

judgment plaintiff apprehends had initiated a lawsuit against the declaratory judgment plaintiff." (internal quotation marks omitted)).

Although the *Skelly Oil* "conceptual realign[ment]" heuristic originated in federal question jurisdiction, this Court recently applied it in assessing admiralty suits. *Id.* at 68-71. While noting that it is not perfectly tailored to the admiralty context, *id.*, we explained that if "*Skelly Oil*'s simple and effective analysis applied only to federal-question jurisdiction, many admiralty litigants (and judges hearing admiralty cases) would miss out on the salutary effects of the [Declaratory Judgment Act]." *Id.* at 70.

In the present case, Leopard Marine, owner of the Vessel, sues seeking a declaration that Easy Street may not enforce its maritime lien. The precedents of *Skelly Oil* and *Garanti Finansal* teach that we must ask, to assure ourselves of jurisdiction, whether Easy Street could have brought a coercive suit in federal court to enforce its lien, i.e., to become owner of the vessel.[4]

---

[4] In this context, the "exercise" or "enforcement" of a maritime lien refers to a lienholder's action to become the owner of the vessel. It does not refer, for example, to a declaration of rights in a lien, such as that sought in the present case.

13

Authorities concur that a maritime lien may be enforced only through an action in rem—that is, by proceeding against the vessel itself. *See*, *e.g.*, 8-VII Joshua S. Force & Steven F. Friedell, Benedict on Admiralty § 7.01 (2017) ("Maritime liens do not exist apart from their ability to be enforced *in rem* in admiralty."); *The Rock Island Bridge*, 73 U.S. 213, 215 (1867) ("The lien and the proceeding *in rem* are, therefore, correlative—where one exists, the other may be taken, and not otherwise."). Generally speaking, "[a]n action in rem . . . [t]o enforce [a] maritime lien" requires court officials to "arrest . . . the vessel or other property that is the subject of the action." Fed. R. Civ. P. Supp. Adm. R. C (1)(a), (3)(a)(i). Here, the question is whether the Vessel's absence from the district would have precluded a suit by Easy Street to exercise its lien, and, if so, whether we lack jurisdiction to consider the "realigned" suit brought by Leopard Marine seeking that the lien be declared unenforceable.[5]

---

[5] In applying the *Skelly Oil* test, courts typically ask whether an action could lie if brought by the defendant in the declaratory action against the plaintiff in the declaratory action. *Garanti Finansal*, 697 F.3d at 68. Here, we encounter an unusual situation: since maritime liens may be exercised only in rem, the realigned non-declaratory suit would not involve Leopard Marine as a party, but would instead involve the Vessel. But, for purposes of declaratory judgment actions regarding maritime liens, courts permit the vessels' owners to serve as

The Supreme Court has referred to in rem jurisdiction as a device of legal fiction intended to promote access to courts. "The fictions of *in rem* forfeiture were developed primarily to expand the reach of the courts and to furnish remedies for aggrieved parties . . . ." *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 87 (1992) (citations omitted). One "purpose[] of the fiction, among others, has been to allow actions against ships where a person owning the ship could not be reached." *Continental Grain Co. v. The FBL-585*, 364 U.S. 19, 23 (1960). As such, "a fiction born to provide convenient forums should not be transferred into a weapon to defeat that very purpose." *Id.* As discussed below, we conclude that our jurisdictional analysis squarely aligns with these principles.

Courts often speak as though physical presence of the res within the territorial jurisdiction of the district court, along with the attachment of the res, is

plaintiffs in place of the vessels themselves. *See Cianbro*, 596 F.3d at 11 (permitting the vessels' owners to serve as plaintiffs-intervenors in an appeal in a declaratory action adjudicating rights in a maritime lien). Although *Cianbro* arose under the declaratory procedure permitted for liens by 46 U.S.C. § 31343, which we discuss more fully below, that statute does not prescribe that owners be permitted to serve as plaintiffs in declaratory actions. We think the conclusion that the vessel's owner may serve as plaintiff in a declaratory action applies just as well to declaratory actions such as this one that are not brought under Section 31343.

15

a hard-and-fast jurisdictional prerequisite for an action in rem, particularly in admiralty. *See, e.g., In re Millenium Seacarriers, Inc.*, 419 F.3d 83, 94 (2d Cir. 2005) ("[S]ubject matter jurisdiction lies in the district court where the vessel or other *res* is located, but that jurisdiction does not attach until the vessel is arrested within the jurisdiction."); *Dow Chem. Co. v. Barge UM-23B*, 424 F.2d 307, 311 (5th Cir. 1970) ("Attachment subjecting the res to the jurisdiction of the court is a prerequisite to a finding of in rem liability."); *The Resolute*, 168 U.S. 437, 439 (1897) ("Jurisdiction . . . . [a]s applied to a suit in rem for the breach of a maritime contract . . . presupposes—First, that the contract sued upon is a maritime contract; and, second, that the property proceeded against is within the lawful custody of the court."). But significant authority clarifies an exception: that, "[i]f the *res* is absent from the district, this . . . jurisdictional defect can be waived if the owner of the *res* voluntarily appears" and "waive[s]" the "presence requirement." 29-704 Moore's Federal Practice - Civil § 704.02 (2017); *Hapag-Lloyd Aktiengesellschaft v. U.S. Oil Trading LLC*, 814 F.3d 146, 153–54 (2d Cir. 2016) ("To obtain jurisdiction . . . a court must either seize the *res* or obtain the consent of the owner or other person asserting a right of possession.").

16

In *Hapag-Lloyd*, this court considered a complex interpleader suit, part of which resolved the validity of a number of maritime liens. 814 F.3d at 149. We held that the consent of a vessel's owner to the adjudication of rights in a maritime lien was sufficient for the court to exercise in rem jurisdiction, regardless of whether the vessel itself was present:

> [The] argument—that *both* parties' consent is necessary in cases where the party initiating suit is the owner of the *res* that the lienholder seeks to arrest—relies on cases holding that where a lienholder brings a claim, both parties' consent is "sufficient" for a court to exercise *in rem* jurisdiction without seizure of the *res.* That is not inconsistent, however, with other cases indicating that only the owner's consent is necessary. *In rem* jurisdiction is "a customary elliptical way of referring to jurisdiction over the interests of persons in a thing." *Shaffer v. Heitner*, 433 U.S. 186, 207 (1977). To obtain jurisdiction over that interest, a court must either seize the *res* or obtain the consent of the owner or other person asserting a right of possession. This principle is demonstrated by the many cases in which *in rem* jurisdiction has been held waived without seizure when the owner appears without contesting jurisdiction. *See, e.g., United States v. Republic Marine, Inc.*, 829 F.2d 1399, 1402 (7th Cir. 1987); *Cactus Pipe & Supply Co. v. M/V Montmartre*, 756 F.2d 1103, 1107–08 (5th Cir. 1985); *cf. Continental Grain Co. v. The FBL–585*, 364 U.S. 19, 22–27 (1960). By initiating an interpleader concerning certain *in rem* claims and posting adequate security for those claims, [the plaintiff] consented to the District Court's jurisdiction over its interests, which is sufficient to confer jurisdiction.

*Id.* (internal quotation marks and citations omitted; other citations abridged).

17

There is admittedly some question as to whether the rule of *Hapag-Lloyd* applies here. That opinion largely discussed the interpleader statute—which created some of the controversy over jurisdiction in rem[6]—and the present case is unrelated to the interpleader mechanism. We nonetheless conclude that *Hapag-Lloyd*'s rule applies in the present case for a number of reasons.

---

[6] The district court's opinion noted that the parties raised two separate arguments based on in rem jurisdiction. The first argument related to whether "the Court could . . . adjudicate the *in rem* claims against the Vessels . . . because, in many cases, the Vessels were never arrested or present in this jurisdiction and the Objecting Claimants did not consent to substitute the amounts on deposit for the *res* that are the subjects of their maritime liens." *UPT Pool Ltd. v. Dynamic Oil Trading (Singapore) PTE. Ltd.*, No. 14-CV-9262, 2015 WL 4005527, at *5 (S.D.N.Y. July 1, 2015), *aff'd sub nom. Hapag-Lloyd Aktiengesellschaft v. U.S. Oil Trading LLC*, 814 F.3d 146 (2d Cir. 2016). The second argument, which raised an in rem argument related to the interpleader statute, was that "the Court lacks subject matter jurisdiction to adjudicate . . . statutory *in rem* claims against the Vessels under 28 U.S.C. § 1335" because "*in rem* claims against the Vessels are 'separate and distinct' from any *in personam* claims against the Vessel Interests and therefore are not amenable to resolution as part of an interpleader, which requires adverse claims arising out of a single obligation." *Id.* We also mentioned the presence of both of these arguments, albeit in a summary fashion. *Hapag-Lloyd*, 814 F.3d at 151 ("[Appellant's] principal argument is that, because [some] claims to payment arise from statutory *in rem* liens . . . [and others] arise from the supply contracts (and thus are correctly characterized . . . as being *in personam* in nature), its codefendants are not claiming entitlement to *the same* money, property, or benefit of the instrument or obligation."); 153 ("[Appellant] also challenges the sufficiency of the District Court's *in rem* jurisdiction.").

To begin, although *Hapag-Lloyd* dealt heavily with interpleader issues, it stated specifically that it considered, for reasons other than just the interpleader requirements, whether in rem jurisdiction existed:

> [The appellee] argues that [the appellant] conflates subject matter and *in rem* jurisdiction, which are distinct. While it is true that some elements of the arguments overlap, [the appellant] makes two arguments: first, the amount of the bond is insufficient under § 1335[, the interpleader statute,] to confer subject matter jurisdiction . . . and second, even if it is sufficient under § 1335, it is insufficient to constitute a substitute *res* for the vessels themselves . . . .

814 F.3d at 153 n.20 (internal citations omitted). The Court also otherwise separated its resolution of the appellant's argument as to "the sufficiency of the District Court's *in rem* jurisdiction," *id.* at 153, from the resolution of the "principal argument" related to interpleader, *see id.* at 151. The Court's discussion of the in rem question thus resolved the argument, as the district court framed it, "that the Court could not adjudicate the *in rem* claims against the Vessels . . . because . . . the Vessels were never arrested or present in this jurisdiction and the [opposing parties] did not consent to substitute the amounts on deposit for the [vessels] that are the subjects of their maritime liens." *UPT Pool Ltd. v. Dynamic Oil Trading (Singapore) PTE. Ltd.*, No. 14-CV-9262, 2015 WL

19

4005527, at *5 (S.D.N.Y. July 1, 2015), *aff'd sub nom. Hapag-Lloyd Aktiengesellschaft v. U.S. Oil Trading LLC*, 814 F.3d 146 (2d Cir. 2016). That issue is nearly identical to the one in this case regarding whether the vessel's presence may be waived if in rem jurisdiction is to be exercised. *Hapag-Lloyd*'s holding thus applies here.

The reasoning of *Hapag-Lloyd* also demonstrates why its rule should apply in this suit. The rule in *Hapag-Lloyd* draws on two lines of doctrine. The first acknowledges that an action in rem, while ostensibly a suit against property itself, is in reality a convenient means of targeting the owner's interest in the property. *See Continental Grain*, 364 U.S. at 26 (noting that an action in rem against a barge is "an alternative way of bringing the owner into court"); *Shaffer*, 433 U.S. at 207 (noting that "the phrase, 'judicial jurisdiction over a thing', is a customary elliptical way of referring to jurisdiction over the interests of persons in a thing" (brackets omitted)). A corollary is that a main purpose of personifying vessels in admiralty—a practice that might otherwise be derided as "irrational" and "atavistic"—is "to allow actions against ships where a person owning the

20

ship could not be reached."[7] *Continental Grain*, 364 U.S. at 23. Accordingly, the Supreme Court does not strictly apply the requirement that the vessel remain present in the district, if its absence would not threaten the owner's participation in the suit.

In *Continental Grain*, the Court permitted transfer of an in rem action from one district to another under 28 U.S.C. 1404(a), which states that "a district court may transfer any civil action to any other district . . . where it might have been brought." *Id.* at 20-21, 26-27. This was true even though the in rem action could not "have been brought" initially in the transferee district, as the vessel was not located there when the plaintiff filed suit. *Id.* at 22. The Court emphasized that its decision to ignore the vessel's physical location served practical and salutary purposes; a contrary ruling demanding physical presence of the res as an absolute jurisdictional requirement would merely have "provide[d] a shelter for in rem admiralty proceedings in costly and inconvenient forums." *Id.* at 27. The

---

[7] This is to say nothing of the origin of the personification of vessels. Evidently, this legal fiction was an application of more widespread rules assigning responsibility to inanimate objects for their own harmful acts. *See* Oliver Wendell Holmes, Jr., The Common Law 24-30 (Dover ed. 1991) (1881). But it is of course not unusual that the later understanding and employment of a rule differs significantly from the rule's initial purpose. *Id.* at 5.

*Continental Grain* Court noted that "the fiction appears to have no relevance whatever in a District Court's determination of where a case can most conveniently be tried. A fiction born to provide convenient forums should not be transferred into a weapon to defeat that very purpose." *Id.* at 23 (also observing that "[t]he concept of the ship as a distinct juridical entity" is no more than "a convenient conceptual tool."). *Continental Grain*—ignored by the dissent—supports our conclusion that a vessel owner's agreement to have its rights in property adjudicated in the forum is sufficient to confer in rem jurisdiction.

The second line of precedent undergirding *Hapag-Lloyd* is one that explains vessel attachment rules governing in rem actions as rules for service of process rather than independent jurisdictional requirements. *See*, *e.g.*, *The St. Lawrence*, 66 U.S. 522, 529 (1861) (noting that in a prior decision, *The General Smith*, 17 U.S. 438 (1819), it was understood that "the right to proceed against the property [was] regarded as a mere question of process and not of jurisdiction"). In *United States v. Republic Marine, Inc.*, the Seventh Circuit held that, even where "jurisdiction [is] never gained over [a vessel] by the supplemental admiralty rules of attachment," that "alone . . . is not enough to prove lack of jurisdiction over the

22

vessel." 829 F.2d 1399, 1402 (7th Cir. 1987). The court went on to explain that "a vessel may waive jurisdiction *in rem* by appearing in the action and failing to raise the defense of lack of jurisdiction over the party in a timely fashion."[8] *Id.* Voluminous authority supports this proposition in the admiralty context. *See Porsche Cars N. Am. Inc. v. Porsche.net*, 302 F.3d 248, 256 (4th Cir. 2002) ("[I]n admiralty and civil forfeiture cases, for years courts have held that objections to in rem jurisdiction may be waived."); *Cactus Pipe and Supply Co. v. M/V Montmartre*, 756 F.2d 1103, 1107-11 (5th Cir. 1985) ("A claimant . . . can waive the necessity of in rem seizure and consent to jurisdiction so far as its interest in the vessel is concerned."); *Reed v. Steamship Yaka*, 307 F.2d 203, 204 (3d Cir. 1962), *rev'd on other grounds*, 373 U.S. 410 (1963) ("While the power of an admiralty court to exercise authority over a ship normally depends upon the arrest of the

---

[8] Although the Seventh Circuit spoke in *Republic Marine* of the vessel's "appearance," we do not take this statement as referring to an actual, physical appearance, but instead as the common legal term of art that refers to participation in the litigation of an action whether or not one is physically present. *See Republic Marine*, 829 F.2d at 1402 ("Of course, the general rule in civil actions is now (and has been for some time) that any appearance in an action is a general appearance, and although the special appearance has not been abolished with respect to admiralty and maritime claims, its preservation requires explicit affirmative acts restricting its appearance." (internal citations omitted)).

ship within the court's territorial jurisdiction, a claimant can waive this requirement and consent to jurisdiction so far as its interest in the vessel is concerned."); *The Willamette*, 70 F. 874, 878 (9th Cir. 1895), *decree modified,* 72 F. 79 (9th Cir. 1895); *see also Farwest Steel Corp. v. Barge Sea Span 241*, 769 F.2d 620, 622 (9th Cir. 1985) (noting rule that courts have exercised in rem jurisdiction over vessels where "the *res,* while beyond the court's territorial jurisdiction, was owned by a party actually before the court, over whom the court already held *in personam* jurisdiction"); *Farwest Steel Corp. v. Barge Sea-Span 241*, 828 F.2d 522, 524 (9th Cir. 1987) (noting that an "exception" to the requirements of territorial presence and attachment of the res in order for a court to possess in rem jurisdiction "is established by the consent of the vessel's owner to in rem jurisdiction.").[9]

---

[9] In *Ventura Packers, Inc. v. F/V Jeanine Kathleen*, 424 F.3d 852, 860-61 (9thCir. 2005), the Ninth Circuit, following *Republic National Bank of Miami,* held that the conditions for in rem jurisdiction—territorial presence and attachment—need only be present at the commencement of a lawsuit, and that if res departs the district and evades the clutches of the court, or if the court releases the res or the substitute res, then the court still retains jurisdiction over the case. That the res's owner can consent to the exercise of jurisdiction despite the absence of the res is reinforced by this principle, under which a court's control over the res is not required during the duration of a lawsuit and possible appeal.

24

We are cognizant of the unusual position that actions in rem occupy within admiralty jurisdiction. Pursuant to the Judiciary Act of 1789, the federal courts have exclusive jurisdiction over in rem actions within admiralty jurisdiction. *See* Charles J. Black, Jr., Admiralty Jurisdiction: Critique and Suggestions, 50 Colum. L. Rev. 259, 263, 265-66 (1950); *Knapp, Stout & Co. v. McCaffrey*, 177 U.S. 638, 642–43 (1900); *Am. Dredging Co. v. Miller*, 510 U.S. 443, 446–47 (1994) ("An *in rem* suit against a vessel is . . . distinctively an admiralty proceeding, and is hence within the exclusive province of the federal courts."); *see also* 28 U.S.C. § 1333.[10] On the other hand, state courts share with the federal courts jurisdiction over most actions in personam. *See* 1 Thomas J. Schoenbaum, Admiralty & Mar. Law § 3-2 (5th ed. 2016); *Am. Dredging Co.*, 510 U.S. at 447 ("In exercising *in personam* jurisdiction . . . a state court may adopt such remedies, and

[10] The provenance of this rule is the "saving to suitors" clause of the Judiciary Act of 1789, which, much like its modern successor in 28 U.S.C. § 1333, gave the district courts "exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction . . . saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it." 1 Stat. 76 (1789). The "saving to suitors" clause was interpreted to allow state courts to adjudicate admiralty cases other than "an admiralty proceeding *in rem*" because such a proceeding "is in no sense a common-law remedy." *The Hine*, 71 U.S. 555, 571 (1866); *see also* 1 Thomas J. Schoenbaum, Admiralty & Mar. Law § 3-2 (5th ed. 2016).

25

attach to them such incidents, as it sees fit so long as it does not attempt to make changes in the substantive maritime law." (internal quotation marks and ellipsis omitted)). Additionally, in rem jurisdiction is sometimes necessary to establish subject matter jurisdiction in admiralty. That situation arises when a suit's only basis of admiralty jurisdiction is enforcement of a maritime lien, since maritime liens can only be enforced through proceedings in rem. *See*, *e.g.*, 8-VII Benedict on Admiralty § 7.01 (2017). This differs from most other settings, where in rem jurisdiction emphatically "deal[s] with personal and not subject matter jurisdiction." *Falise v. Am. Tobacco Co.*, 241 B.R. 48, 62 (E.D.N.Y. 1999) (citing *Cargill, Inc. v. Sabine Trading & Shipping Co., Inc.*, 756 F.2d 224, 228–29 (2d Cir. 1985)).

Since in rem jurisdiction is necessary, in this case, for subject matter jurisdiction in admiralty, our dissenting colleague argues that our ruling impermissibly gives parties permission to waive challenges to subject matter jurisdiction. That is not so. We reiterate the reasoning above. If the requirement that a vessel be arrested is a mere matter of service of process, and a practical means of getting at the owner's property, then there is no reason that it could not

26

be waived under appropriate circumstances. That is not the same as allowing the parties to waive the requirement of in rem jurisdiction itself where, as here, it is necessary for subject matter jurisdiction. The dissent's major error is to conflate these two wildly different requirements—arrest and in rem jurisdiction. In many other areas of the law, in rem jurisdiction cannot require an arrest or seizure since the property is intangible. *Cf. Hanson v. Denckla*, 357 U.S. 235, 247 (1958) (noting, in discussion of in rem jurisdiction, that "[i]n considering restrictions on the power to tax, this Court has concluded that 'jurisdiction' over intangible property is not limited to a single State"). Despite the dissent's suggestion to the contrary, there is no fundamental rule that actual seizure or possession of an object is always required for in rem jurisdiction over it. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 312 (1950) ("Distinctions between actions in rem and those in personam are ancient and originally expressed in procedural terms what seems really to have been a distinction in the substantive law of property under a system quite unlike our own. . . . American courts have sometimes classed certain actions as in rem because personal service of process was not required, and at other times have held personal service of process not

27

required because the action was in rem."). In short, the vessel's arrest is simply not a matter of jurisdiction itself. It therefore can be waived, even though the requirement of subject matter jurisdiction obviously cannot be waived.

Other, less direct, considerations support our conclusion that jurisdiction exists over this case. One is a realization that, absent a rule permitting the vessel's owner to waive its arrest to confer jurisdiction in declaratory judgment actions, the Declaratory Judgment Act would seem not to apply to most maritime lien disputes. The Federal Rules of Civil Procedure permit seizure of a vessel for actions in rem. *See* Fed. R. Civ. P. Supp. Adm. R. C(3)(a)(i) ("If the conditions for an in rem action appear to exist, the court must issue an order directing the clerk to issue a warrant for the arrest of the vessel or other property that is the subject of the action."). But they apparently lack a procedure for the situation here: an in personam action where the court's jurisdiction is *not* in rem, but *derivative* of theoretically-possible jurisdiction in rem. If any substitute exists, it would be some lesser requirement—perhaps that a vessel appear in the district, or that the owner produce property of equivalent value—but without court process ensuring the vessel's continued presence. But if so, then the vessel,

28

and the court's jurisdiction, would remain only at the owner's pleasure. One can imagine the impracticality of requiring a federal judge to scan the harbor for the physical basis of the court's jurisdiction before issuing any order. And, of course, upon the whiff of an impending adverse judgment, both the vessel and the court's jurisdiction would likely set sail. *Cf. Lozman v. City of Riviera Beach, Fla.*, 133 S. Ct. 735, 744 (2013) ("Admiralty law . . . provides special attachment procedures lest a vessel avoid liability by sailing away."). Under this rule, declaratory suits regarding maritime liens would be unworkable as a practical matter. We think such a result "would . . . contravene the well settled rule that the Declaratory Judgment Act should be liberally construed to accomplish its purpose of providing a speedy and inexpensive method of adjudicating legal disputes without invoking coercive remedies and that it is not to be interpreted in any narrow or technical sense." *Garanti Finansal*, 697 F.3d at 70.

We observe, also, that the Congress has passed a statute permitting declaratory judgment actions in admiralty for the adjudication of rights in maritime liens recorded with the Secretary of the Department of Homeland Security. 46 U.S.C. § 31343(c)(2) ("The district courts of the United States shall

29

have jurisdiction over a civil action in Admiralty to declare that a vessel is not subject to a lien claimed under subsection (b) of this section, or that the vessel is not subject to the notice of claim of lien, or both, regardless of the amount in controversy or the citizenship of the parties."). The existence and application of this statute demonstrates that the availability of declaratory actions to adjudicate claims in liens is neither legally dubious nor likely to be disruptive to maritime commerce. *See, e.g.*, *Cianbro Corp. v. George H. Dean, Inc.*, 596 F.3d 10, 11 (1st Cir. 2010) (considering, under Section 31343(c)(2), an appeal of a district court's order that "issued a declaratory judgment to the effect that [two] Vessels were not subject to a maritime lien"). We do not take the existence of Section 31343 to limit the possibility that declaratory actions will be available for liens *not* recorded with the Secretary, as the statute contains a savings clause stating that it "does not alter in any respect the law pertaining to the establishment of a maritime lien, the remedy provided by such a lien, or the defenses thereto." 46 U.S.C. § 31343(f). And "[t]he purpose of a savings clause is . . . to nix an inference that the statute in which it appears is intended to be the exclusive remedy for harms caused by the

violation of the statute." *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 618 (7th Cir. 1998).

Finally, we note that the rule we today endorse has been applied by our district courts in declaratory actions in past years. *See Kristensons-Petroleum, Inc. v. Sealock Tanker Co., Ltd.*, 304 F. Supp. 2d 584, 590 (S.D.N.Y. 2004). And the remedy we are describing—in personam adjudication of rights in a maritime lien—is available through the interpleader statute under *Hapag-Lloyd*. 814 F.3d 146.

The dispute considered here is one seeking a declaration that a maritime lien is not enforceable. We have no occasion to discuss what, if any, authority the Declaratory Judgment Act provides courts to issue other declarations regarding maritime liens. But we are satisfied that the federal courts possess jurisdiction to adjudicate the dispute before us.

## II. Abstention Pursuant to International Comity

Easy Street contends that the district court erred in denying its motion to dismiss or stay the case in deference to the Panamanian proceedings on grounds of international comity. "We review a district court's decision to extend or deny

31

comity to a foreign proceeding for abuse of discretion." *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999).

"International comity has been described by the Supreme Court as 'the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.'" *JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 423 (2d Cir. 2005) (quoting *Hilton v. Guyot*, 159 U.S. 113, 164 (1895)). "[I]nternational comity is clearly concerned with maintaining amicable working relationships between nations, a shorthand for good neighbourliness, common courtesy and mutual respect between those who labour in adjoining judicial vineyards." *Id.* (internal quotation marks omitted). "We have stated that the doctrine is not an imperative obligation of courts but rather is a discretionary rule of practice, convenience, and expediency." *Id.* (internal quotation marks omitted).

"While the doctrine can be stated clearly in the abstract, in practice we have described its boundaries as 'amorphous' and 'fuzzy.'" *Royal & Sun All. Ins.*

*Co. of Can. v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92 (2d Cir. 2006) (citation

omitted). "Generally, concurrent jurisdiction in United States courts and the

courts of a foreign sovereign does not result in conflict" requiring dismissal or

stay of a case for comity concerns. *Id*. "The mere existence of parallel foreign

proceedings does not negate the district courts' 'virtually unflagging obligation .

. . to exercise the jurisdiction given them.'" *Id.* (quoting *Colo. River Water

Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). In particular, "parallel

proceedings in the same in personam claim should ordinarily be allowed to

proceed simultaneously, at least until a judgment is reached in one which can be

pled as res judicata in the other." *Id.* (brackets omitted).

In order for a court to decline jurisdiction on grounds of international

comity, it must find "exceptional circumstances exist that justify the surrender of

that jurisdiction." *Id.* at 93. "The exceptional circumstances that would support

such a surrender must, of course, raise considerations which are not generally

present as a result of parallel litigation, otherwise the routine would be

considered exceptional, and a district court's unflagging obligation to exercise its

jurisdiction would become merely a polite request." *Id.* "We have recognized one

33

discrete category of foreign litigation that generally requires the dismissal of parallel district court actions—foreign bankruptcy proceedings"—because "[a] foreign nation's interest in the equitable and orderly distribution of a debtor's property is an interest deserving of particular respect and deference." *Id.* at 93-94 (internal quotation marks omitted).

Easy Street makes two arguments as to why the district court should have relinquished jurisdiction in favor of either dismissal or a stay of the case while the Panamanian in rem proceeding was ongoing. First, Easy Street claims that this case satisfies a list of factors articulated in *Royal & Sun*, factors that guide the analysis of whether international comity militates against exercising jurisdiction. The *Royal & Sun* opinion articulated those factors as follows:

> In the context of parallel proceedings in a foreign court, a district court should be guided by the principles upon which international comity is based: the proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency. Proper consideration of these principles will no doubt require an evaluation of various factors, such as [1] the similarity of the parties, [2] the similarity of the issues, [3] the order in which the actions were filed, [4] the adequacy of the alternate forum, [5] the potential prejudice to either party, [6] the convenience of the parties, [7] the connection between the litigation and the United States, and [8] the connection between the litigation and the foreign jurisdiction. This list is not exhaustive, and a district court should examine the

34

"totality of the circumstances" to determine whether the specific facts before it are sufficiently exceptional to justify abstention.

*Royal & Sun*, 466 F.3d at 94 (internal citations omitted). Easy Street contends that each factor in this list weighs in favor of dismissal or stay of the American action in favor of the Panamanian suit. In particular, Easy Street argues that: (1) the parties and (2) the issues are identical in the actions;  (3) the Panamanian suit was filed first, and the laches issue had already been briefed in Panama when the motion to dismiss was filed in the United States; (4) the district court expressly stated that Panamanian courts could ably handle the dispute;  (5) Easy Street suffered prejudice, as Leopard Marine filed a suit in the United States to cause Easy Street significant expense in litigating duplicative suits in multiple locations and languages; (6) neither party has a connection to the United States, and both are inconvenienced by litigating here;  (7) the court should not determine that the United States has a strong connection to the case simply because American law will govern it;  and (8) Panama has greater connection to the case, particularly because of its exclusive jurisdiction over any in rem action resolving ownership of the Vessel.

35

Easy Street argues that, in addition to satisfying the above-enumerated factors, this case presents "exceptional circumstances" favoring abstention, as required by *Royal & Sun*, because the Panamanian courts have exercised in rem jurisdiction over the Vessel. In support of the proposition that a foreign court's exercise of in rem jurisdiction is an "exceptional circumstance," Easy Street cites a number of cases suggesting that, in at least some circumstances, exercise of in rem jurisdiction "disables other courts of coordinate jurisdiction from exercising a like power." *Farmers' Loan & Tr. Co. v. Lake St. Elevated R.R. Co.*, 177 U.S. 51, 61 (1900); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15 (1983); *Woodford v. Cmty. Action Agency of Greene Cty., Inc.*, 239 F.3d 517, 522 (2d Cir. 2001) (noting that, in an abstention analysis, the court should consider "whether the controversy involves a res over which one of the courts has assumed jurisdiction") (citing *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976)). Easy Street contends that the district court has essentially displaced the Panamanian courts' power to exercise jurisdiction over the res in this case, which it claims is inconsistent with the doctrine of international comity.

We have some doubt as to whether all eight factors from *Royal & Sun* unproblematically weigh in favor of deferring to the Panamanian proceedings. In particular, the district court concluded—and Easy Street does not dispute—that American law governs the case, which creates some connection between the United States and this suit. We have noted that "public interest" weighs in favor of having "a case heard in a forum at home with the law that must govern the case." *Blanco v. Banco Indus. de Venez., S.A.*, 997 F.2d 974, 983 (2d Cir. 1993) (internal quotation marks and ellipsis omitted).

We have even greater doubt that the fact of a foreign proceeding in rem is, without more, enough of an "exceptional circumstance" to merit abstention in an American in personam action on grounds of international comity.

The general rule is that "concurrent proceedings" regarding the same question are "tolerat[ed]." *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36 (2d Cir. 1987). It is true that this rule admits of "[a] long-standing exception," *id.*, that "if the two suits are in rem, or quasi in rem . . . the jurisdiction of the one court must yield to that of the [first to consider the action]," *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939). The

37

exception, which some have called the "prior exclusive jurisdiction" doctrine,

*Chapman v. Deutsche Bank Nat. Tr. Co.*, 651 F.3d 1039, 1043 (9th Cir. 2011),

emerged "because of the threat a second action poses to the first court's basis for

jurisdiction." *China Trade*, 837 F.2d at 36 (citing *Donovan v. City of Dallas*, 377 U.S.

408 (1964), and *Princess Lida*, 305 U.S. 456). The "threat" emerges because "if the

two suits are in rem, or quasi in rem . . . the court, or its officer, has possession or

must have control of the property which is the subject of the litigation in order to

proceed with the cause and grant the relief sought," which means that both

courts cannot claim jurisdiction of the same property, and so "the jurisdiction of

the one court must yield to that of the other." *Princess Lida*, 305 U.S. at 466; *see*

*also Carvel v. Thomas & Agnes Carvel Found.*, 188 F.3d 83, 85-86 (2d Cir. 1999)

(discussing *Princess Lida*'s rule and describing it as "a prudential doctrine of

abstention"). "The logical and practical difficulty of two courts simultaneously

vying for possession or control of the same property is the key" to the conflict.

*United States v. $79,123.49 in U.S. Cash & Currency*, 830 F.2d 94, 97 (7th Cir. 1987);

*see also Hagan v. Lucas*, 35 U.S. 400, 403 (1836) ("A most injurious conflict of

jurisdiction would be likely, often, to arise between the federal and the state

38

courts; if the final process of the one could be levied on property which had been taken by the process of the other.").

But the prior exclusive jurisdiction doctrine does not generally apply to situations where one action is in rem and the other in personam. The adjudication of rights in personam simply does not impede the possession or control of the property required for maintenance of an in rem action. The Supreme Court explained as much in a conflict between state and federal courts in *United States v. Klein*, 303 U.S. 276 (1938). In *Klein*, a state court in Pennsylvania exercised jurisdiction to declare the escheat of funds, even though the funds had been deposited into the registry of a federal court to satisfy a judgment in a federal suit. *Id.* at 277. The United States appeared in the state case, and moved to dismiss "on the ground that the state court was without jurisdiction to escheat moneys in the custody of the United States or of its courts." *Id.* at 279. The Supreme Court of Pennsylvania held that the state court could exercise jurisdiction to declare escheat of the funds, because "exercise of that jurisdiction involved no interference with the federal court and no attempted control over

funds in its custody." *Id.* The United States Supreme Court agreed, explaining as follows:

> While a federal court which has taken possession of property in the exercise of the judicial power conferred upon it by the Constitution and laws of the United States is said to acquire exclusive jurisdiction, the jurisdiction is exclusive only in so far as restriction of the power of other courts is necessary for the federal court's appropriate control and disposition of the property. Other courts having jurisdiction to adjudicate rights in the property do not, because the property is possessed by a federal court, lose power to render any judgment not in conflict with that court's authority to decide questions within its jurisdiction and to make effective such decisions by its control of the property. Similarly a federal court may make a like adjudication with respect to property in the possession of a state court.

*Id.* at 281 (internal citations omitted). In short, even when property is within the "possession" and "exclusive jurisdiction" of one court, a second court does not "lose power to render any judgment not in conflict with [the first] court's authority to decide questions within its jurisdiction and to make effective such decisions by its control of the property." *Id.* In *Klein*, declaration of rights in the funds did not impede another court's possession and control of the funds themselves.

Courts of appeals invariably reach the same conclusion, stating more broadly the principle that one court's exercise of jurisdiction in rem does not prevent other courts from declaring rights in the res within an in personam action. The First Circuit, although recognizing that "a court cannot exercise jurisdiction over a *res* that is already subject to the *in rem* jurisdiction of another court," has stated that "if only one of the actions is *in rem*, and the other is *in personam*, the cases may proceed simultaneously." *United States v. One 1986 Chevrolet Van*, 927 F.2d 39, 44 (1st Cir. 1991). Similarly, the Seventh Circuit understands *Klein* and other precedent to mean that "if only one of the actions is *in rem* or *quasi in rem*, both cases may proceed side by side." *$79,123.49 in U.S. Cash*, 830 F.2d at 97 (citing *Klein*, 303 U.S. 276).

The same principle governs this case. The Panamanian proceeding is one in rem, but the present case, an action in personam, merely adjudicates *rights* in the res. Our declaration of rights in the res does not impair the Panamanian court's possession of the res or its authority over it. The prior exclusive jurisdiction doctrine does not apply, and thus does not create an exceptional circumstance that would permit abstention.

41

This case is admittedly unusual. Plaintiff comes to court seeking a declaration in personam. But the suit, if filed as a non-declaratory action by defendant, would likely be brought in rem, and, had it been brought in rem, the prior exclusive jurisdiction doctrine might well counsel in favor of abstention. We have, moreover, not required an absolute jurisdictional bar for a case's circumstances to be sufficiently "exceptional" that they merit abstention. One could thus argue that the close kinship of this case to a proceeding in rem gives reason enough for us to abstain as though it *were* a second proceeding adjudicating the same res. But the doctrine of prior exclusive jurisdiction—and the exceptional circumstances it might present justifying abstention—derive from the practicalities of in rem proceedings, not from the character of rights those proceedings adjudicate. Despite its similarity to an in rem proceeding, this case does not require us to keep custody over any property, either in actuality or constructively. We thus pose no challenge to the foreign court's possession of the res. For comity purposes, this suit is no different from an ordinary proceeding in personam running parallel to an in rem adjudication. And that situation, without more, is not "exceptional."

42

Accordingly, the district court did not abuse its discretion in declining to abstain in deference to the Panamanian proceedings.

**III.    Laches**

Easy Street next contends that the district court incorrectly determined that laches barred execution of its maritime lien. "Laches . . . . is an equitable defense that bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998) (internal quotation marks omitted).

**A. Standard of Review**

"The existence of laches is a factual question that requires the court to weigh the equities of each case." 8-VII Benedict on Admiralty § 7.01 (7th ed. 2017). Because of the case-specific nature of the doctrine, we review for abuse of discretion a district court's rulings regarding laches. *DeSilvio v. Prudential Lines, Inc.*, 701 F.2d 13, 15 (2d Cir. 1983) ("[The district court] granted summary judgment in appellee's favor, finding DeSilvio had been guilty of laches. . . . Determinations relating to a claim of laches ordinarily are left to the discretion of the trial court. These rulings may not be overturned unless the trial court has

43

abused its discretion." (internal citations omitted)); *see also Czaplicki v. The Hoegh Silvercloud*, 351 U.S. 525, 534 (1956) ("[T]he existence of laches is a question primarily addressed to the discretion of the trial court."). Abuse of discretion is a high standard and is met only when the district court "based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (quotations omitted).

Easy Street notes that our opinion in *Ivani Contracting Corp. v. City of N.Y.* appeared to say that summary judgment granted based on laches should be reviewed de novo. 103 F.3d 257, 259 (2d Cir. 1997) ("We review the district court's grant of summary judgment *de novo. . . .* Ivani argues that the district court erred in holding that laches could bar its claims. We agree."). But in *Ivani Contracting Corp.*, we held that "laches is not available to bar . . . claims for damages under [42 U.S.C.] § 1983," *id.* at 262, and thus decided the legal permissibility of applying laches to a class of legal claims rather than the appropriateness of a laches ruling on the facts of a particular case. Consequently, *Ivani Contracting Corp.* does not detract from the statement of law in *DeSilvio*. We

44

review laches rulings dependent on the facts and equities of a given case for abuse of discretion.[11]

### B. Laches Defense to Easy Street's Lien

We next consider whether the district court correctly held that laches extinguished Easy Street's maritime lien.

"There is no fixed period of time that must elapse for a suit to be barred by the doctrine of laches." 8-VII Benedict on Admiralty § 7.01 (7th ed. 2017). The ultimate test for laches is whether there has been (1) inexcusable delay in exercising a lien and (2) prejudice to the party against whom the lien would be enforced. *Czaplicki*, 351 U.S. at 533 ("Where there has been no inexcusable delay in seeking a remedy and where no prejudice to the defendant has ensued from

---

[11] Easy Street also relies on *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, where we stated that a de novo standard of review applied to summary judgment based on laches. 219 F.3d 104, 107 (2d Cir. 2000). But there, too, we held that a laches argument foundered at "a dispositive, threshold inquiry" of whether the party seeking application of laches "[came] into equity . . . with clean hands." *Id.* We explained that the "clean hands" question was one that "bars further consideration of the laches defense" rather than serving as "a mere factor to be weighed in balancing the equities." *Id.* Thus, much like in *Ivani Contracting*, de novo review was appropriate because our ruling did not concern the district court's analysis of the equities in the case, but instead made a ruling on the basis of a dispositive legal question at the threshold.

the mere passage of time, there should be no bar to relief."); *DeSilvio*, 701 F.2d at 15. "[T]hese two factors are not to be viewed independently." *Larios v. Victory Carriers, Inc.*, 316 F.2d 63, 67 (2d Cir. 1963). Even where there has been delay, "[a] weak excuse may suffice if there has been no prejudice; an exceedingly good one might still do even when there has been some." *Id.* As the Fifth Circuit observed in *Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co.*, "[l]aches is much more than time. It is time plus prejudicial harm, and the harm is not merely that one loses what he otherwise would have kept, but that delay has subjected him to a disadvantage in asserting and establishing his claimed right or defense." 261 F.2d 861, 865 (5th Cir. 1958).

"[I]n deciding whether maritime claims are barred by laches, courts of admiralty will use local limitation statutes as a rule-of-thumb." *Larios*, 316 F.2d at 66 (quoting *Oroz v. Am. President Lines, Ltd.*, 259 F.2d 636, 639 (2d Cir. 1958)). "When the suit has been brought after the expiration of the state limitation period, a court applying maritime law asks why the case *should* be allowed to proceed; when the suit, although perhaps long delayed, has nevertheless been brought within the state limitation period, the court asks why it *should not* be." *Id.*

46

(emphasis added); *see also Federal Treasury Enterprise Sojuzplodoimport v. Spirits Int'l B.V.*, 809 F.3d 737, 745-46 ("If the most closely analogous state statute of limitations has not run, the presumption of laches does not attach and the defendant bears the burden of proving the defense.").

The district court held—and the parties do not dispute—that the relevant local statute of limitations is Section 83 of the New York Lien Law. That statute states as follows:

> Every lien for a debt shall cease if the vessel navigates the western or northwestern lakes, or either of them, or the Saint Lawrence river, at the expiration of six months after the first of January next succeeding the time when the debt was contracted, and *in case of any other vessel, at the expiration of twelve months after the debt was contracted*. If, upon the expiration of the time herein limited in either of such cases, such vessel shall be absent from the port at which the debt was contracted, the lien shall continue until the expiration of *thirty days after the return of such vessel to such port*. If proceedings are instituted for the enforcement of the lien within the time herein limited, such lien shall continue until the termination of such proceedings.

N.Y. Lien Law § 83 (emphasis added).

The district court noted that Allied purchased fuel from Easy Street in Mejillones, Chile and never returned there. Under the New York statute, when the "vessel [is] absent from the port at which the debt was contracted" one year

47

after the debt was contracted, "the lien shall continue until the expiration of thirty days after the return of such vessel to such port." N.Y. Lien Law § 83. Because the Vessel never returned to Mejillones, it was absent from that port one year after the debt was contracted. Consequently, the court treated the statute of limitations as never having expired. Easy Street agreed with this conclusion.[12] The district court nonetheless concluded that the delay and prejudice to Leopard Marine in the enforcement of the lien were so great that laches should be applied. Easy Street protests that decision.

Laches decisions are largely limited to the facts of each case. But a few principles emerge from past decisions. A key consideration in deciding whether delay is excusable is whether the lienor failed to "exercise[] reasonable diligence

---

[12] Leopard Marine suggests that the New York statute should be understood as providing a limitations period of twelve months, and a *tolling* period that extends until thirty days after the vessel returns to the port where the transaction occurred. Leopard Marine then suggests that we should not apply state-law tolling rules, but should instead look to tolling rules from federal maritime statutes to supplement state statutes of limitations.

Although this Court has suggested that both the 12-month period and the additional period (that operates until the vessel returns to port) are considered part of the New York limitations period in laches decisions based on Section 83 of the New York lien law, *see The Owyhee*, 66 F.2d 399, 400 (2d Cir. 1933), we need not address the point: Leopard Marine prevails even on Easy Street's more generous view of the New York limitations period.

in arresting" the vessel. *Barwil ASCA v. M/V SAVA*, 44 F. Supp. 2d 484, 488 (E.D.N.Y. 1999). At a minimum, that generally requires that a lienor had an opportunity to enforce the lien. *See The Everosa*, 93 F.2d 732, 735 (1st Cir. 1937) (noting that a significant factor in deciding whether laches bars exercise of a lien against a vessel's bona fide purchaser is whether the lienor had "a reasonable opportunity to enforce" the lien) (quoting *Magee v. The Lyndhurst*, 48 F. 839, 840 (S.D.N.Y. 1892)).[13] For example, in *The Gertrude*, the Fifth Circuit denied a laches defense where the owner hid a boat "for the purpose of preventing its seizure in libel proceedings." 38 F.2d 946, 947 (5th Cir. 1930). Although some courts have said, as an extension of this principle, that "lienors are not required to attempt to enforce their liens in foreign waters," *Bermuda Exp., N.V. v. M/V Litsa (Ex. Laurie U)*, 872 F.2d 554, 559 (3d Cir. 1989), we have not said so as a strict matter, and have never said as much in contemporary times. *But see The Slingsby*, 120 F. 748,

---

[13] We note that, "where the lien is to be enforced to the detriment of a [bona fide] purchaser for value, without notice of the lien, the defence [of laches] will be held valid under shorter time, and a more rigid scrutiny of the circumstances of the delay, than when the claimant is the owner at the time the lien accrued." *The Key City*, 81 U.S. 653, 660 (1871). Nevertheless, cases setting out the rules that apply when the vessel's owner is a bona fide purchaser, *see The Everosa*, 93 F.2d at 735, are still instructive for cases such as the one at present, where the owner has remained the same from the time the lien arose.

753 (2d Cir. 1903) (finding laches inapplicable because the vessel spent little time "within the jurisdiction . . . between the injury and the libel").

A laches defense may be justifiable where delay diminishes a party's ability to absorb a loss. *See* Uisdean R. Vass & Xia Chen, *The Admiralty Doctrine of Laches*, 53 La. L. Rev. 495, 518 (1992) (noting that, among "[t]he most typical cases of prejudice are where the defendant has . . . lost the right to contribution or indemnity [or] lost the right to pass on costs to its customers"). This may happen, for example, because lawsuits against third parties no longer lie. *See Murphy v. Int'l Freighting Corp.*, 182 F. Supp. 636, 640 (D. Mass. 1960) (noting that "plaintiff's delay in bringing his action has seriously prejudiced defendant," in part because "[d]efendant has been unable to determine with certainty the stevedore who loaded the vessel at its previous port of call, who might be liable to defendant"), *aff'd sub nom. Murphy v. A/S Sobral*, 283 F.2d 392 (1st Cir. 1960); *United Fruit Co. v. The M. D. Whiteman*, 125 F. Supp. 898, 900 (E.D. La. 1954) (noting that delay was prejudicial because, by the time the claim was pressed, insurance coverage was time-barred). Reflecting that principle, this court has said that "a person asserting a maritime lien on a chartered vessel is obliged to move promptly, so that the

50

owner may effectively pursue his rights of indemnification against the charterer." *United States v. S.S. Lucie Schulte*, 343 F.2d 897, 901 n.3 (2d Cir. 1965).

The district court considered also the principle that if a lienholder, "instead of proceeding with reasonable diligence to arrest the vessel, preferred to collect in personam, such delay, occasioned by such choice, cannot be overlooked if . . . libelant now seeks to proceed in rem." *The Mendotta II*, 13 F. Supp. 1019, 1020 (E.D.N.Y. 1935); *see also The Owyhee*, 66 F.2d 399, 401 (2d Cir. 1933) (ruling that the creditor's "attempt to collect" from the vessel's owner "was obviously an alternative and was independent of [the lienholder's] rights as a lienor," and thus was "no justification for the delay" in exercising the lien). We think that principle is sound in many cases, though it must be applied carefully. The choice of whether to pursue a remedy in rem, or instead to proceed informally or by in personam legal action against the debtor, typically lies in the lienholder's hands. It is thus inequitable for others to bear the costs of that choice. On the other hand, in many cases, pursuit of a remedy in rem is far more costly than pursuit of monetary payment, and also far more disruptive to commerce. *See The Clinton*, 160 F. 421, 422 (5th Cir. 1908) ("A maritime lien is a powerful instrument. It

enables a creditor . . . to attach and seize a vessel, even though . . . she is loaded with freight and filled with passengers and about to proceed upon a voyage. It gives him power to inflict almost irreparable injury upon the debtor . . . ."). A rule requiring lienholders to pursue in rem remedies whenever possible would likely cause great waste. For that reason, we have said that "[w]here an *owner* and a lienholder have come to an . . . arrangement for payment of an undisputed lien claim . . . failure to litigate the lien should be excused so long as the arrangement is being carried out," and that "[t]o hold the opposite would be an unwise policy, injurious alike to vessel owner and lienholder." *In re Marine Transit Corp.*, 94 F.2d 7, 10 (2d Cir. 1938) (emphasis added). We certainly decline to adopt any rule that requires the lienor to bear the costs of *any* failure to pursue a remedy in rem, even where such pursuit would have been unreasonable.

Applying those principles to the facts of this case, we determine that the district court did not abuse its discretion. Allied's fuel bill was initially due September 26, 2011, a bit more than one month after the fuel was contracted for. Easy Street does not dispute the district court's determination that Easy Street failed to inform Leopard Marine until at least the latter half of 2013 that Allied

had never paid the bill. Consequently, when Allied delivered the Vessel to Leopard Marine in November of 2011, Leopard Marine was unaware of Allied's failure to pay its outstanding fuel bill. Thus, Leopard Marine credited Allied with $409,853.10 for the value of fuel on board the Vessel.

Easy Street's failure even to inform Leopard Marine of Allied's non-payment of the fuel bill within the first few months prejudiced Leopard Marine, as reflected in several of the laches principles articulated above. First, had Leopard Marine known in late 2011 that Allied had failed to pay Easy Street, Leopard Marine could have declined to give Allied a credit for the value of the fuel left in the Vessel when it returned. Second, Leopard Marine also could have exercised its lien over Allied's cargo, pursuant to the chartering agreement, at the time of the Vessel's redelivery. In other words, Easy Street's lack of notice eliminated two of Leopard Marine's possible remedies against Allied, and thus diminished Leopard Marine's ability to absorb any loss. Although Easy Street's failure to inform Leopard Marine of the nonpayment does not relate strictly to delay in exercising the lien, it weighs heavily on the equities of the case.

After that point, Easy Street's conduct with respect to Allied bespoke an odd mixture of extreme alarm and lack of pursuit of any meaningful remedy. As noted above, Demitrios Chasampalis, Easy Street's only full-time employee in 2011, went to roughly one hundred in-person meetings at Allied's offices, beginning around the invoice's issuance in 2011 and ending sometime in 2012. He demanded full payment of the invoice instead of any settlement of the debt, but never received any payment at all. Easy Street also received two written assurances of payment, neither of which was honored. Yet Easy Street did not think to sue Allied, instead trusting the close relationship between the companies and, evidently, between the persons running them. Only after Allied entered involuntary bankruptcy proceedings did Easy Street begin tracking the Vessel, and it was not until long after Allied's bankruptcy that Easy Street requested payment from Leopard Marine. Moreover, as the district court noted, and as Easy Street does not successfully dispute, there were several opportunities before Allied's bankruptcy to seize the Vessel in a port that would have honored the lien.

The facts of this case implicate the principle the district court applied: where a lienor chooses to take time to proceed in personam or informally, trusting that the indebted party—here, the charterer—is good for its commitments, the vessel's owner should not bear the costs of that choice. *See The Mendotta II*, 13 F. Supp. at 1020. In this case, the lienor gave a close, long-term business partner more trust and leeway than circumstances merited. If the lien were now to be exercised, that trust and leeway—and the delay they occasioned—would prejudice Leopard Marine.

Moreover, Easy Street failed to respect our guidance in *S.S. Lucie Schulte*, that "a person asserting a maritime lien on a chartered vessel is obliged to move promptly, so that the owner may effectively pursue his rights of indemnification against the charterer." 343 F.2d at 901 n.3. Had Easy Street instead exercised the lien before Allied's bankruptcy in November 2012, Leopard Marine would have had some chance to recover from Allied through an arbitration, or exercise of the cargo liens, before Allied's bankruptcy. That is no longer a possibility. Easy Street's actions are even more striking because of its failure to notify Leopard Marine of Allied's debt in any way until at least October 2013. By that time—

more than a year after Easy Street began tracking the Vessel—any possible recovery against Allied was long gone. Had Easy Street merely notified Leopard Marine of the debt when it began tracking the Vessel, Leopard Marine may have had a greater chance of recovery from Allied.

Easy Street emphasizes that the Greek court administering Allied's bankruptcy proceedings stated that "all payments to any creditors of Allied . . . ceased retrospectively as of January 1, 2012," Appellant's Br. at 7, and suggests that, because of this "retrospective" ruling, Leopard Marine could not have recovered anything from Allied after that date, Appellant's Br. at 37. But Easy Street provides no explanation of what a "retrospective" stoppage of payments means, or how it affected the likelihood of recovery. Although Easy Street cites a legal opinion from a Greek lawyer, the opinion simply restates what Easy Street's brief claims: that the bankruptcy court "considered [Allied] (retrospectively) to have stopped payments to its creditors since [January 1, 2012]." App'x at 325. The legal opinion then concludes only that, "[a]ssuming that Leopard Marine . . . was not made aware of East Street['s] . . . outstanding claim against Allied for the [fuel] Easy Street supplied . . . until *March 30, 2015* . . . any attempt by Leopard to

56

make a claim in the Allied bankruptcy proceeding [after *that* time] would have been futile." App'x at 326 (emphasis added). The document contains no statements regarding whether Leopard Marine could have pressed claims against Allied before November of 2012, and, if so, what the value of those claims might have been.

Leopard Marine responds to Easy Street's argument with expert testimony that, before the November 6, 2012 bankruptcy order issued, there was no prohibition on suit against Allied, at least in certain forums, and that Leopard Marine might also have exercised liens against Allied's cargo during the period. App'x at 557-558. Easy Street does not dispute these assertions in any direct way. In the district court, Easy Street agreed that Leopard Marine could have brought claims against Allied at any time before November 6, 2012, but did so "subject to the reservation that Allied['s] . . . bankruptcy declaration was deemed retroactive to January 1, 2012." *See* App'x at 569 ¶ 38; App'x at 351 ¶ 38. The record establishes that Easy Street's delay deprived Leopard Marine of remedies it could have availed itself of, including causes of action against Allied in certain forums and the right to exercise liens on Allied's cargo, until the Greek

57

bankruptcy court issued its order on November 6, 2012, which purportedly extinguished, nunc pro tunc, the payments Allied still needed to make to its creditors from January 1, 2012. Easy Street has not called into question the viability or value of these causes of action. The elimination of viable causes of action that would permit a party to absorb a loss weighs heavily in determining that prejudice exists. *See S.S. Lucie Shulte*, 343 F.2d at 901 n.3. It was thus not an abuse of discretion for the district court to conclude that Easy Street's failure to take any action with respect to Leopard Marine during this period prejudiced Leopard Marine by depriving it of these remedies.

We do not think the district court committed clear error in discerning that Leopard Marine suffered additional prejudice because it lost the opportunity to assert causes of action against Allied. The record clearly demonstrates that Easy Street's delay deprived Leopard Marine of causes of action that it otherwise could have used until November of 2012. Easy Street has not included any factual material raising a genuine question as to the viability or value of those causes of action. And, as noted earlier, foreclosure of causes of action that would permit a party to absorb a loss has widely been weighed in determining whether

prejudice exists. *See S. S. Lucie Schulte*, 343 F.2d at 901 n.3. We do not depart from that sensible principle here.

Because of the significant prejudice caused by Easy Street's delay in exercising the lien, the district court did not abuse its discretion in ruling that laches extinguished the lien.

## CONCLUSION

We have reviewed Easy Street's other arguments and have determined that they are meritless. The district court's judgment is AFFIRMED.

DEBRA ANN LIVINGSTON, *Circuit Judge*, dissenting:

"[P]arties may not confer subject matter jurisdiction on [an Article III] court by consent." *Cable Television Ass'n of N.Y., Inc. v. Finneran*, 954 F.2d 91, 94 (2d Cir. 1992); *accord Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998); *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("[N]o action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant . . . ."); *Doe v. United States*, 833 F.3d 192, 196 (2d Cir. 2016); *New York v. Shinnecock Indian Nation*, 686 F.3d 133, 138 (2d Cir. 2012); *Bay Shore Union Free Sch. Dist. v. Kain*, 485 F.3d 730, 733 (2d Cir. 2007). By holding that the Maltese owner of a vessel arrested in Panama can satisfy a United States maritime court's *in rem* subject matter jurisdiction requirement simply by consenting to adjudication, the majority departs from this fundamental and "well established" rule. *See Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 238 (2d Cir. 2006).

In so doing, the majority forgets that we are "courts of limited jurisdiction whose power is limited strictly," especially in the maritime context. *See Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 64–65 (2d Cir. 2012) (quoting *Ahmed v. Holder*, 624 F.3d 150, 154 (2d Cir. 2010)). Unlike in other

settings, where *in rem* jurisdiction typically is a matter of personal, and not subject matter jurisdiction, in this appeal, our subject matter jurisdiction depends on our jurisdiction over the *res* (*i.e.*, the Densa Leopard ship). Because we lack jurisdiction over the *res*, and thus are without subject matter jurisdiction, I respectfully dissent.

## A

I agree with the majority's declaratory judgment analysis, *see* Maj. Op. at 10–14, and so do not belabor this point. Briefly, "the Declaratory Judgment Act does not by itself confer subject matter jurisdiction on the federal courts." *Correspondent Servs. Corp. v. First Equities Corp.*, 442 F.3d 767, 769 (2d Cir. 2006) (per curiam). Instead, a declaratory judgment action is available only in cases where there is an independent jurisdictional basis over the underlying dispute. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) (explaining that the Declaratory Judgment Act "enlarged the range of remedies available in the federal courts but did not extend their jurisdiction"). "[A] complaint seeking a declaratory judgment is to be tested . . . as if the party whose adverse action the declaratory judgment plaintiff apprehends had initiated a lawsuit against the declaratory judgment plaintiff." *Fleet Bank v. Burke*, 160 F.3d 883, 886 (2d Cir. 1998). In other words, we must "examine the structure of the suit that would ultimately take place if it were

2

not forestalled by the declaratory judgment action"; "[i]f that suit could not be brought in federal court, we do not have jurisdiction in the analogous declaratory judgment action[,] [but] [i]f the suit could be brought in federal court, we [do] have jurisdiction . . . ." *Garanti*, 697 F.3d at 70 (internal citations omitted). The dispositive question, then, is whether the declaratory judgment defendant, here Easy Street Ltd. ("Easy Street"), a Cypriot bunker supply company, could have brought a coercive suit to enforce its maritime lien under the district court's admiralty jurisdiction, *see* Maj. Op. at 13–14. It could not.

## B

A maritime lien is a "lien on a vessel, given to secure the claim of a creditor who provided maritime services to the vessel or who suffered an injury from the vessel's use." *Maritime Lien*, *Black's Law Dictionary* 1065 (10th ed. 2014). Unlike a standard lien, which is a device to secure a creditor's interests against a debtor, the distinct legal fiction created by the maritime lien is that the vessel itself is the obligor. *See Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 10 (1920) ("A vessel may be made liable in rem for supplies, although the owner can be made liable therefor in personam, since the dealer may rely upon the credit

of both."); *see also id.* at 8–9 (discussing the historical development of the maritime lien).

As a result, as the majority acknowledges, *see* Maj. Op. at 13, the maritime lien itself (as distinct from any related contractual obligation) may be enforced only in a federal *in rem* proceeding against the vessel. *See, e.g., Am. Dredging Co. v. Miller*, 510 U.S. 443, 446–47 (1994) ("An *in rem* suit against a vessel is, we have said, distinctively an admiralty proceeding, and is hence within the exclusive province of the federal courts." (citing *The Moses Taylor*, 71 U.S. 411, 431 (1866))); *Madruga v. Super. Ct.*, 346 U.S. 556, 560 (1954) ("Admiralty's jurisdiction is exclusive . . . as to those maritime causes of action begun and carried on as proceedings in rem, that is, where a vessel or thing is itself treated as the offender and made the defendant by name or description in order to enforce a lien." (citations and internal quotation marks omitted)); *Norton v. Switzer*, 93 U.S. 355, 356 (1876) ("[T]he jurisdiction of the admiralty courts to enforce a maritime lien is exclusive, and cannot be exercised in any other mode than by a proceeding *in rem*."); *In re Millenium Seacarriers, Inc.*, 419 F.3d 83, 93 (2d Cir. 2005) (Sotomayor, *J.*) ("Traditional admiralty principles suggest that only a federal admiralty court acting *in rem* has the jurisdiction to quiet title to a vessel conclusively by

4

extinguishing its maritime liens.").[1]  As the Supreme Court has elsewhere expressed it, "[t]he lien and the proceeding in rem are . . . correlative – where one exists, the other may be taken, and not otherwise." *The Rock Island Bridge*, 73 U.S. 213, 215 (1867); *accord DS-Rendite Fonds Nr. 108 VLCC Ashna GMBH & Co Tankschiff KG v. Essar Capital Americas Inc.*, 882 F.3d 44, 48 (2d Cir. 2018).  This view is reinforced by the text of the statute that would underlie Easy Street's hypothetical suit, which, by its terms, permits only *in rem* enforcement of a maritime lien for necessaries.  46 U.S.C. § 31342(a)(2); *see also Piedmont*, 254 U.S. at 12 ("The maritime lien is . . . . stricti juris and will not be extended by construction, analogy or inference.").

Here, we have admiralty jurisdiction to hear Leopard Marine's declaratory judgment action only if Easy Street could have brought an affirmative suit in the district court to enforce its maritime lien.  The inquiry is straightforward:  because

---

[1] Numerous well-established authorities confirm this rule. *See, e.g.*, 8-VII Joshua S. Force & Steven F. Friedell, *Benedict on Admiralty* § 7.01[A] (2017) ("Maritime liens do not exist apart from their ability to be enforced *in rem* in admiralty."); 1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 9-1 (5th ed. 2011 & Supp. 2017) (noting that a maritime lien "adheres to the maritime property even through changes of ownership until it is either executed through the *in rem* legal process available in admiralty or is somehow extinguished by operation of law"); *see also* Griffith Price, *The Law of Maritime Liens* 1 (1940) (noting that a maritime lien is "enforced by means of an action in rem"); Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* § 9–2 at 588 (2d ed. 1975) (explaining that maritime liens "can be 'executed' (which is the admiralty terminology for 'foreclosed') only by an admiralty court acting *in rem*[]"); *id.* at 622.

a maritime lien is enforced *in rem*, absent federal court jurisdiction over the *res*, Easy Street could not have proceeded against the Densa Leopard *in rem*. *See, e.g.*, *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 363 (1984) (noting that *in rem* jurisdiction traditionally has been "dependent upon seizure of a physical object"). In other words, in this admiralty appeal, where our jurisdiction stems from 28 U.S.C. § 1333, our subject matter jurisdiction depends on our jurisdiction over the Densa Leopard (which was arrested in Panama and is not here). And because we lack jurisdiction over the Densa Leopard, we lack jurisdiction to adjudicate the parallel declaratory judgment action. *See Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 848 (2014) ("The relevant question [in examining jurisdiction underlying declaratory judgment actions] concerns the nature of the threatened action in the absence of the declaratory judgment suit.").

The majority seeks to avoid this simple conclusion by reconceptualizing admiralty *in rem* jurisdiction as "a mere matter of service of process, and a practical means of getting at the owner's property." Maj. Op. at 26. But that view conflates the *in rem* jurisdiction that is necessary here for *subject matter* jurisdiction with the *in rem* jurisdiction that is often necessary for *personal* jurisdiction. Admittedly, the distinction between these two concepts can be thin – as evidenced by the cases

6

cited by the majority that discuss *in rem* jurisdiction solely in the context of *personal* jurisdiction. *See, e.g.*, *Shaffer v. Heitner*, 433 U.S. 186, 207 (1977) (addressing the due process constraints on *personal* jurisdiction rather than the distinct issue of subject matter jurisdiction in admiralty); *United States v. Republic Marine, Inc.*, 829 F.2d 1399, 1402 (7th Cir. 1987) ("*[A]s with other forms of jurisdiction over the party*, a vessel may waive jurisdiction in rem by appearing in the action and failing to raise the defense of lack of jurisdiction over the party in a timely fashion." (emphasis added) (internal citation omitted)). But the distinction is a critical one. After all, a party can satisfy a federal court's personal jurisdiction requirement by consent; it cannot, however, satisfy a federal court's subject matter jurisdiction requirement by doing the same. *See, e.g.*, *Ins. Corp. of Ireland*, 456 U.S. at 702–03.

Our case law makes clear that in an *in rem* admiralty action where our jurisdiction comes from 28 U.S.C. § 1333, jurisdiction over the *res* is fundamental to our *subject matter* jurisdiction. As then-Judge Sotomayor explained, "[l]ienors seeking to bring an admiralty action *in rem* face stringent access requirements before securing the aid of the federal court to enforce their liens." *Millennium Seacarriers*, 419 F.3d at 94. Specifically, she emphasized, "subject matter jurisdiction lies in the district court *where the vessel or other* res *is located*[.]" *Id.*

7

(emphasis added); *see also Mackensworth v. S.S. Am. Merch.*, 28 F.3d 246, 252 (2d Cir. 1994) ("Subject matter jurisdiction in an *in rem* action in admiralty lies in the district court where the vessel or other res is located."). And, on top of the stringent subject matter jurisdictional requirement that the *res* must be located in the district, then-Judge Sotomayor added, "jurisdiction does not attach until the vessel is arrested within the jurisdiction." *Millennium Seacarriers*, 419 F.3d at 94; *see also Burns Bros. v. Long Island R. Co.*, 176 F.2d 950 (2d Cir. 1949) (per curiam) (holding, under the predecessor to the current admiralty rules, that because "there has been no arrest of the vessel . . ., jurisdiction to enter a decree in rem is lacking"). Thus, much as a declaratory judgment action turning on federal question jurisdiction is limited by the jurisdictional prerequisites of the well-pleaded complaint rule, *see Skelly Oil*, 339 U.S. at 671–72, the availability of a declaratory judgment action turning on admiralty jurisdiction is bound by the constraints on our jurisdiction under 28 U.S.C. § 1333, including the requirement that a plaintiff proceed on a maritime lien *in rem*. And even when both parties in a suit "are satisfied to present their dispute[] to [a] federal court[], the parties cannot confer subject matter jurisdiction where the Constitution and Congress

8

have not." *Doe*, 833 F.3d at 196 (quoting *Wynn v. AC Rochester*, 273 F.3d 153, 157 (2d Cir. 2001)).

By holding to the contrary, the majority broadly expands our admiralty jurisdiction. According to the majority, there is no requirement for a ship ever to have been remotely near the United States before it can be subject to a federal court's *in rem* subject matter jurisdiction. As a result, whenever a foreign owner of a foreign ship in a foreign country believes that a maritime lien proceeding brought by a foreign party in a foreign court is going poorly, the shipowner can simply come to our shores and acquire a declaratory judgment. *Cf.* Richard H. Fallon, Jr. et al., *Hart and Wechsler's The Federal Courts and the Federal System* 872–73 (7th ed. 2015) (noting that the purpose of federal admiralty jurisdiction is to *further* international cooperation). Similarly, given federal courts' general obligation to hear cases within their jurisdiction, when two foreign parties locked in a dispute over a maritime lien asserted against a foreign ship agree that it should be heard in New York – regardless of the ship's location – a federal court here now must presumably arbitrate that dispute and expend judicial resources to do so. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014) ("'[A] federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually

9

unflagging.'" (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014))). The holding here thus comes very close to transforming our Circuit into an "International Court of Maritime Liens" with universal jurisdiction. Needless to say, absent further guidance from Congress, we should hesitate before reading our grant of subject matter jurisdiction so broadly. *See Garanti*, 697 F.3d at 64–65 (noting that "[t]here is always a 'presumption against jurisdiction,'" and that our "venerable case law" consequently strictly limits our maritime jurisdiction (quoting *Miller v. United States*, 78 U.S. 268, 299 (1870))).[2] The Supreme Court has cautioned against reading jurisdictional statutes in a way that would cause us to become "the *custos morum* of the whole world." *Kiobel v. Royal*

---

[2] The majority cites 46 U.S.C. § 31343(c)(2) in an attempt to show that it would be "neither legally dubious nor likely to be disruptive to maritime commerce" to allow Leopard Marine to seek a declaratory judgment in this case. Maj. Op. at 29. But § 31343(c)(2) is of no help to the majority. As an initial matter, that statute only provides jurisdiction to adjudicate lien claims on vessels that, unlike the Densa Leopard, are owned by *American* entities. *See* 46 U.S.C. §§ 12103, 31343(a), 31343(b), 31343(c)(2). But even more importantly, § 31343(c)(2) merely grants federal courts jurisdiction to hear *in personam* suits to *extinguish* alleged maritime liens, while we have subject matter jurisdiction in this declaratory judgment action only if Easy Street could have brought an *in rem* suit to *enforce* its alleged maritime lien. *See, e.g.*, *Millenium Seacarriers*, 419 F.3d at 102 (recognizing that "proceedings other than *in rem* admiralty actions [can] extinguish[] individual lienors' rights to their maritime liens"); *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024, 1028 (2d Cir. 1973) ("*[I]n rem* jurisdiction in the admiralty exists only to *enforce* a maritime lien . . . ." (emphasis added)). That § 31343 "does not alter in any respect the law pertaining to the *establishment* of a maritime lien," 46 U.S.C. § 31343(f) (emphasis added), reveals that the statute is of no moment to the instant dispute – that is, whether Easy Street could have brought such an *in rem* action.

10

*Dutch Petroleum Co.*, 569 U.S. 108, 123 (2013) (quoting *United States v. The La Jeune Eugenie*, 26 F. Cas. 832, 847 (No. 15,551) (C.C. Mass. 1822) (Story, *J.*)). The majority, however, would have us become something quite similar: a "*custos navibus.*"

C

The closest jurisdictional argument – and the crux of the majority's analysis – turns on our decision in *Hapag-Lloyd Aktiengesellschaft v. U.S. Oil Trading LLC*, 814 F.3d 146 (2d Cir. 2016). I agree with the majority's candid observation that "[t]here is admittedly some question as to whether the rule of *Hapag-Lloyd* applies here." Maj. Op. at 17. There, a shipowner, Hapag-Lloyd, had entered into bunker supply contracts with O.W. Bunker & Trading A/S ("O.W. Denmark"). *Hapag-Lloyd*, 814 F.3d at 148. When O.W. Denmark went bankrupt, U.S. Oil Trading LLC ("USOT"), the O.W. Denmark subcontractor who had actually provided the bunkers to the Hapag-Lloyd ships, instituted *in rem* proceedings around the country seeking to enforce its maritime liens against Hapag-Lloyd's vessels. *Id.* at 148–49. In response, Hapag-Lloyd filed an interpleader action in district court, posted bond for the amount claimed, and moved for an anti-suit injunction against the various *in rem* actions. *Id.* at 149–50. USOT appealed, arguing that, absent jurisdiction over the *res*, there was no basis for the district court to exercise jurisdiction over its *in*

*rem* claims, and that an anti-suit injunction stemming from the interpleader action was inappropriate.

In resolving the matter, we first recognized that only minimal diversity of the parties is necessary to an interpleader action, 28 U.S.C. § 1335(a)(1), and that, given the parties' respective domiciles, we clearly had *in personam* jurisdiction to adjudicate the merits of the contract claims running between O.W. Denmark and Hapag-Lloyd – contract claims that O.W. Denmark was pressing in connection with the bunkers provided by USOT. *Id.* at 150–51. We explained further that since any *in rem* claim to collect on USOT's maritime liens was "inextricably interrelated" to any merits determination on O.W. Denmark's contract claims, jurisdiction under the interpleader action was appropriate even if the resolution of these contract claims would not necessarily (absent the interpleader action) have extinguished USOT's maritime liens. *Id.* at 152. Finally, we rejected USOT's argument that, because the district court did not have *in rem* jurisdiction, it could not rule on the validity of USOT's maritime liens. *Id.* at 153. Although we identified the general rule reflected in *Millennium Seacarriers* that "subject matter jurisdiction lies in the district court where the vessel or other *res* is located, [and] that jurisdiction does not attach until the vessel is arrested within the jurisdiction,"

we held this rule inapplicable to a case, like Hapag-Lloyd's, in which the party instituting the action had (1) initiated a jurisdictionally appropriate interpleader; (2) posted adequate security for those claims; and (3) consented to the court's jurisdiction over its interests in the *res*. *See id.* at 153–54.

Although we upheld jurisdiction in *Hapag-Lloyd*, that case did not modify our admiralty jurisdiction precedents, and instead depended on the flexibility of the interpleader mechanism. Critically, unlike here, in *Hapag-Lloyd* we *did* have *in personam* jurisdiction to review the merits of O.W. Denmark's contract claims against Hapag-Lloyd.[3] Since the basic predicate for the interpleader action – minimal diversity of the parties – was already present, the panel in *Hapag-Lloyd* considered only whether the interpleader mechanism permitted the district court to exert jurisdiction over USOT's linked and "inextricably interrelated," *id.* at 152 (internal quotation marks omitted), and "inextricably intertwined," *id.* at 153, *in rem* claims.

Furthermore, the factors which were present in *Hapag-Lloyd* and supported our jurisdiction over the *res* there despite the general rule demanding *in rem*

---

[3] Leopard Marine does not (and could not) argue that the bunker fuel supply contract (to which it was not a party) permits *in personam* jurisdiction over it in this case, nor does it ask for a judicial declaration of what Easy Street's *contractual* rights – as distinct from its *maritime lien* – might be.

jurisdiction are not present in this appeal.  In particular, Leopard Marine does not

appear to have (1) submitted to the jurisdiction of the federal courts other than for

purposes of determining the viability of Easy Street's claims against the *Densa*

*Leopard* (as Leopard Marine does not suggest that an action could be maintained

against *it* as party to the original bunker fuel supply contract); or (2) posted bond

to serve as a substitute *res* in place of the Densa Leopard.[4]  *See id.* at 153–54 & n.20.

Without such grounds for jurisdiction, and in light of "the long standing principle

that the Declaratory Judgment Act . . . does not expand the jurisdiction of the

federal courts," I would conclude that Leopard Marine cannot bring a viable

declaratory judgment action.  *Albradco, Inc. v. Bevona*, 982 F.2d 82, 85 (2d Cir. 1992)

(citations and internal quotation marks omitted).

     To be sure, the majority seizes on certain language in *Hapag-Lloyd* to support

its different view.  Relying in part on *Hapag-Lloyd*'s language that "[*i*]*n rem*

jurisdiction is a customary elliptical way of referring to jurisdiction over the

interests of persons in a thing," Maj. Op. at 17 (citation and internal quotation

---

[4] The absence of these two factors here easily distinguishes *Continental Grain Co. v. The FBL-585*, 364 U.S. 19 (1960), an inapposite venue case resorted to by the majority.  Unlike here, where there is no possible *in personam* claim, in *Continental Grain* an *in rem* claim merely was joined with an already pending, jurisdictionally appropriate *in personam* claim against a barge owner.  And, again unlike here, in *Continental Grain* there was a substitute *res*.

14

marks omitted), the majority surmises that Leopard Marine can manufacture admiralty jurisdiction simply by consenting to a judicial determination as to whether Easy Street's efforts to attach Leopard Marine's interest in the Densa Leopard are barred by laches.

However, the cases cited in *Hapag-Lloyd* and by the majority are largely beside the point in assessing our subject matter jurisdiction and leave me unpersuaded. For instance, as noted above, *Shaffer* involved due process constraints on *personal* jurisdiction and not the issue here: subject matter jurisdiction in admiralty. 433 U.S. 186. And, to take other examples, in both *Republic Marine, Inc.*, 829 F.2d 1399, and *Cactus Pipe & Supply Co. v. M/V Montmartre*, 756 F.2d 1103 (5th Cir. 1985), out-of-circuit cases relied on in *Hapag-Lloyd* (and by the majority), the vessel was present in the relevant district (unlike the Densa Leopard) and thus – wholly apart from and unrelated to the subject matter jurisdiction inquiry – the "*vessel* [could] waive jurisdiction *in rem* by appearing in the action and failing to raise the defense of lack of jurisdiction *over the party* in a timely fashion," *Republic Marine*, 829 F.2d at 1402 (emphases added).

Nothing in the supposedly "[v]oluminous authority" cited by the majority (none of which comes from the Supreme Court or our Circuit), Maj. Op. at 22–23,

15

purports to supplant the bedrock and binding tenet that – even though consent can confer *personal* jurisdiction – consent cannot create *subject matter* jurisdiction. *See, e.g., Ins. Corp. of Ireland*, 456 U.S. at 702; *Shinnecock Indian Nation*, 686 F.3d at 138. Indeed, all of the circuits pointed to by the majority – the Third, Fourth, Fifth, Seventh, and Ninth – have unsurprisingly affirmed that, unlike in the personal jurisdiction context, the parties' consent *cannot* establish subject matter jurisdiction. *See, e.g., Coffin v. Malvern Fed. Sav. Bank*, 90 F.3d 851, 854 (3d Cir. 1996) ("[J]urisdiction cannot be conferred by consent."); *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004) (en banc) ("Subject-matter jurisdiction cannot be conferred by the parties, nor can a defect in subject-matter jurisdiction be waived by the parties."); *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 802 (5th Cir. 2011) ("Litigants cannot bestow subject matter jurisdiction on federal courts by waiver or consent."); *DeBartolo v. Healthsouth Corp.*, 569 F.3d 736, 740 (7th Cir. 2009) (noting that "[s]ubject-matter jurisdiction is not an issue that can be brushed aside or satisfied by agreement between the litigants"); *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1006 n.6 (9th Cir. 2010) ("It is well established that subject matter jurisdiction cannot be expanded or contracted by prior action or consent of the parties." (citation and internal quotation marks

16

omitted)).  The cases on which the majority relies are thus correctly read to involve personal jurisdiction rather than dramatically to expand our subject matter jurisdiction in admiralty.

In sum, *Hapag-Lloyd* provides no authority for the step the majority takes today.  Here we ask if we would have admiralty jurisdiction under 28 U.S.C. § 1333 over Easy Street's affirmative suit to enforce its maritime lien, whereas in *Hapag-Lloyd*, we asked how far federal court jurisdiction extends under the interpleader statute, "which is remedial and to be liberally construed."  *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 533 (1967).  I am mindful that a smattering of language in the older case law provides some consolation to the majority, such as a statement from Chief Justice Taney that "the right to proceed against the property [is] regarded as a mere question of process and not of jurisdiction."  *The St. Lawrence*, 66 U.S. 522, 529 (1861) (cited in the Maj. Op. at 21–22).  But because, as described above, the weight of our case law militates in the other direction, I remain convinced that *Hapag-Lloyd* was decided in the specific (and liberal) procedural context of interpleader actions and instead would conclude that nothing in *Hapag-Lloyd*, or elsewhere, confers jurisdiction in this appeal.

* * *

17

The majority concedes that: (1) "subject matter jurisdiction obviously cannot be waived," Maj. Op. at 27; (2) "in rem jurisdiction is necessary, in this case, for [our] subject matter jurisdiction in admiralty," *id.* at 25; and (3) the *res* (the ship) was arrested in Panama and is not here, nor is there a substitute *res* in its place. In nonetheless holding that we have *in rem* jurisdiction over a *res* (a foreign ship in a foreign country owned by a foreign party) that is not here, the majority gives short shrift to our precedent's explicit teaching that, for lienors bringing an admiralty action *in rem*, "subject matter jurisdiction lies in the district court where the vessel or other *res* is located," *Millennium Seacarriers*, 419 F.3d at 94 (Sotomayor, *J.*); *see also Mackensworth*, 28 F.3d at 252 ("Subject matter jurisdiction in an *in rem* action in admiralty lies in the district court where the vessel or other res is located."). And in dispensing with any semblance of a requirement that our *in rem* jurisdiction demands a *res* within this country (much less our Circuit), the majority has propagated an astonishing jurisdictional theory: any owner of any ship subject to a maritime lien proceeding anywhere in the world can now – without limitation

18

and without any connection to the United States – seek a declaratory judgment in the Second Circuit.  Because this cannot be right, I respectfully dissent.[5]

---

[5]  Having determined that we lack jurisdiction, I proceed no further and express no view on the majority's discussion of international comity abstention and laches, *see* Maj. Op. at 30–57.